# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                Case No. 15-CR-129

DONTA HOLMES, JR,

        Defendant.

## REPORT AND RECOMMENDATION

### INTRODUCTION

On May 3, 2015, the grand jury returned a one-count indictment charging Donta Holmes, being an unlawful user of a controlled substance, with knowingly possessing a firearm, a violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2). (ECF No. 1.) On July 24, 2015, Holmes filed a Motion to Suppress Evidence and requested an evidentiary hearing. (ECF No. 8.) The court held an evidentiary hearing on September 10, 2015, and the parties submitted post-hearing briefs. (ECF Nos. 14, 17, 18, 19.) The motion is now ready for resolution.

# FACTS

Holmes, Police Officers Jacob Ivy and Mark Horstmeyer, and two other witnesses testified at the evidentiary hearing. (ECF No. 15 at 4, 48, 68, 80.) From that testimony the following facts were elicited.

On May 3, 2015, the Milwaukee Police Department received an anonymous tip, the details of which appeared on the Computer Automated Dispatch (CAD) System in Ivy's and Hostmeyer's squad car. (ECF No. 15 at 5.) The anonymous caller stated that a man at 4408 North 30th Street in Milwaukee, Wisconsin, was armed with a firearm in his pocket and was possibly involved in a shooting the week before. (ECF No. 15 at 6.) The caller described the subject as a black male in his twenties with dreadlocks and a ponytail and wearing all black. (ECF No. 15 at 6.)

Police officers Daniel Lewis and Timothy Toth were initially dispatched to the scene. (ECF No. 15 at 7.) Ivy, who was in a squad car with his partner Horstmeyer, volunteered to back up the two dispatched officers because the residence had several complaints of drug dealing and was in a high-crime area. (ECF No. 15 at 8.) The assignment was designated "priority one," which means that someone is either in great danger or imminently in great danger. (ECF No. 15 at 8.)

The house at 4408 North 30th Street is a small, single-family home with a front and back yard. Connecting the front and back yards, in between 4408 and 4406 North 30th Street, is a ten to twelve foot wide area known as a gangway. (ECF No. 15 at 21.) A

small metal fence surrounds the property. Marques Brown, a friend of Holmes, and Brown's mother live at the residence. (ECF No. 15 at 69). Holmes does not live there. (ECF No. 15 at 70).

Ivy drove north past the front of the residence while Horstmeyer, who was in the passenger seat, described the scene to him. (ECF No. 15 at 8.) Horstmeyer counted between eight and ten people congregated in or near the gangway. (ECF No. 15 at 50.) According to Horstmeyer, one of the individuals matched the description provided by the anonymous caller. (ECF No. 15 at 10, 53.) The person was later identified as Holmes. (ECF No. 15 at 11.) Holmes stood in the gangway, closer to the front yard than the back yard. (ECF No. 15 at 64.) According to Holmes, they were having a barbecue.

Ivy continued to drive north until the end of the block, where the officers convened with officers Toth and Lewis. (ECF No. 15 at 52.) The four officers decided that Toth and Lewis would approach the residence from the front yard, while Ivy and Horstmeyer would approach from the alley behind the residence. According to Ivy, the dual-approach was "more tactically safe and sound" than the officers all approaching from the front yard. (ECF No. 15 at 22.)

After driving south down the alley, Ivy parked behind a garage at 4408 North 30th Street so that no one would see the officers approach. (ECF No. 15 at 22.) Ivy and Horstmeyer got out of their car and approached the back yard. (ECF No. 15 at 11.) The fence's gate was open. (ECF No. 15 at 11-12.) Ivy, followed by Horstmeyer, walked into

3

the backyard. (ECF No. 15 at 11, 54.) Ivy testified that his intent was to ascertain Holmes's name, whether he was involved in a shooting, whether he was carrying a firearm, and, if so, whether he had a permit to do so. (ECF No. 15 at 30.)

Ivy testified that, as he entered the backyard, Holmes was standing in the back yard between the house and the garage. (ECF No. 15 at 10.) Ivy and Holmes made eye contact. (ECF No. 15 at 12.) Holmes then quickly turned his body away, placed "both of his hands in the front of his waistband," and began walking toward the front yard. (ECF No. 15 at 12.) According to Horstmeyer, no one else moved away from the officers. (ECF No. 15 at 54-55.) Ivy yelled two or three times for Holmes to stop moving and to show his hands. (ECF No. 15 at 12-13.) Holmes did not comply. (ECF No. 15 at 12-13.) Instead, he kept his hands on his waistband and quickened his pace. (ECF No. 15 at 13.) Ivy, fearing Holmes might attempt to use a firearm, removed his own firearm and held it in the "low ready position." (ECF No. 15 at 13.) Ivy then ran up to Holmes, wrapped his arms around him, and tackled him to the ground. (ECF No. 15 at 14.) With the assistance of other officers, Ivy handcuffed Holmes and found a revolver in the front left pocket of Holmes's pants. (ECF No. 15 at 15.)

Ivy estimated that about fifteen to twenty seconds elapsed between the time Holmes saw the officers and when Ivy tackled him. (ECF No. 15 at 16.) In this time, Holmes traveled about fifty feet. (ECF No. 15 at 16.) Horstmeyer's estimate was that it was "at least ten feet." (ECF No. 15 at 56.)

Holmes testified that earlier that day he had smoked marijuana. (ECF No. 15 at 96.) He said that he was talking on his cell phone with his cousin, Shontrell Calhoun, immediately before Ivy tackled him. (ECF No. 15 at 100.) Holmes was walking toward the front yard to meet Calhoun, who was waiting in a car for Holmes. (ECF No. 15 at 100.) He denied having seen the police or having heard them direct him to stop. (ECF No. 15 at 104.) Holmes had a permit to carry a concealed firearm. (ECF No. 15 at 103.) He heard his friend's younger brother yell out, "there's the boys," a phrase that Holmes understood to mean the police. (ECF No. 15 at 102.) He turned his head to make sure that his firearm was in his back pocket. (ECF No. 15 at 110.) Holmes was in the process of putting his phone into his pocket when he was tackled. (ECF No. 15 at 101.)

## ANALYSIS

"Police officers may detain a suspect for a brief investigatory stop if they have a 'reasonable suspicion based on articulable facts that a crime is about to be or has been committed.'" *United States v. Williams*, 731 F.3d 678, 683 (7th Cir. 2013) (quoting *United States v. Carlisle,* 614 F.3d 750, 754-55 (7th Cir. 2010)); *Terry v. Ohio*, 392 U.S. 1 (1968). To conduct a *Terry* stop, police must have a "reasonable suspicion that criminal activity is afoot." *Matz v. Klotka*, 769 F.3d 517, 522 (7th Cir. 2014), *cert. denied,* No. 14-1045, 2015 WL 802341 (U.S. Apr. 27, 2015). Reasonable suspicion is more than an "inchoate and unparticularized suspicion or hunch" but less than "probable cause and…considerably less than preponderance of the evidence." *Illinois v. Wardlow,* 528 U.S. 119, 123-124

(2000). It requires "'some minimal level of objective justification' for making a stop" based on the totality of the circumstances. *United States v. Sokolow,* 490 U.S. 1, 7 (1989) (quoting *INS v. Delgado*, 466 U.S. 210, 217 (1984)). The determination involves "common-sensical judgments and inferences about human behavior." *United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010) (quoting *Wardlow*, 528 U.S. at 125)).

Holmes argues that the officers did not have reasonable suspicion to conduct a *Terry* stop of him. For starters, he argues that the anonymous tip did not provide the officers with a reasonable suspicion that a crime was being, had been, or was about to be committed. It is not unlawful for someone to carry a firearm if he has a permit to do so, and the anonymous caller's statement that the subject might have been involved in a shooting the week before was unsubstantiated. In addition, Holmes argues, he had the right to ignore the police and go about his business, *see Florida v. Royer*, 460 U.S. 491, 498 (1983), so his exercising that right did not provide the police with a basis for conducting a *Terry* stop.

The government argues that the officers did have reasonable suspicion to conduct an investigatory stop based on the combination of the anonymous tip, the fact that the house was in a high crime area and that there had been a number of drug dealing complaints about this house specifically, and Holmes's conduct once the police arrived.

The officers articulated reasonable safety concerns stemming from the nature and location of the incident. *See United States v. Tinnie*, 629 F.3d 749, 752 (7th Cir. 2011). The CAD Report, in paraphrasing the anonymous tip, stated that the subject was "involved in a shooting that occ[urred] in the area 1 w[ee]k ago." (Ex. 1.) (The sensible inference being that the "involved" subject was the shooter, as opposed to a victim or witness, as argued by Holmes.) The CAD Report also noted that the subject was carrying a firearm in his pocket, which automatically raised the assignment to a priority one. (ECF No. 15 at 8). Additionally, the residence was located in a high-crime area and had been the subject of numerous complaints for drug dealing. (ECF No. 15 at 8, 15.) Having said all of that, location in a high crime area alone does not establish reasonable suspicion, *see Wardlow*, 528 U.S. at 124, and anonymous tips without corroboration to demonstrate reliability do not provide reasonable suspicion to make an investigatory stop. *See Florida v. J.L.*, 529 U.S. 266, 270 (2000).

The tipping point, when the officers could reasonably suspect that criminal activity was afoot, was the way Holmes reacted upon spotting Ivy and Horstmeyer. Contrary to Holmes's argument, he did not continue to "go about his business" upon seeing the police officers. Rather, when he made eye contact with Ivy, he (and he alone) immediately turned and walked away from the officers, quickening his pace. "Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite." *Wardlow*, 528 U.S. at 125. Nothing in the case law suggests that "flight" refers only to an

7
Case 2:15-cr-00129-LA   Filed 11/10/15   Page 7 of 10   Document 22

all-out sprint. According to Ivy, Holmes was clearly trying to leave the area. The fact that Holmes was the only person in the group who began to walk away from them increased the suspicion. *See U.S. v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010).

Moreover, as he was walking away, Holmes placed his hands near his waistband, a gesture that led Ivy to believe that Holmes was reaching for a firearm in his pocket. Ivy's suspicion was supported by the anonymous tip that someone matching Holmes's description was carrying a firearm in his pocket and had been involved in a shooting the week before. In *U.S. v. Mattes*, 687 F.2d 1039 (7th Cir. 1982), the Seventh Circuit Court of Appeals held that an officer's "concern about a person turning away and moving a hand toward the waist upon entry by the police was reasonable, especially when coupled with Mattes's semblance to the suspect." *Id.* at 1042. Holmes's evasive and what could reasonably be construed as threatening conduct is viewed in light of the surrounding circumstances. Given all of these facts, the officers had reasonable suspicion to detain Holmes.

The next question is whether the officers acted properly in searching Holmes once they detained him. *Terry* provides that an officer who during a lawful investigatory stop reasonably suspects that the person being investigated is armed and dangerous may "conduct a carefully limited search of the outer clothing of such person[] in an attempt to discover weapons which might be used to assault him." *Terry*, 392 U.S. at 30. In other words, *Terry* "allows police officers—during an investigatory

8

stop founded on reasonable suspicion that a crime is being, has been, or is about to be committed—to frisk a detained person for weapons if the officers have an articulable suspicion that the person is both armed and a danger to the safety of officers or others." *United States v. Leo*, 792 F.3d 742, 748 (7th Cir. 2015).

Here, for the reasons stated above, the officers had an articulable suspicion that Holmes was armed and a danger to their safety as well to that of others. They were told he had a gun on him and his actions upon seeing them, reaching toward his waistband as he walked away from the police and ignoring their demands that he stop, gave them reason to believe that he was armed and dangerous. As such, they acted properly in searching Holmes once they detained him.

Holmes's last argument is that the officers trespassed onto the curtilage of private property when they conducted the search and seizure. He argues that any seized evidence that the officers obtained from their warrantless trespass is presumptively a Fourth Amendment violation. (ECF No. 17 at 14-16.) The Government responds that Holmes did not possess any property interest in 4408 North 30th Street. And the protections for those who have an ownership interest in the property, such as Brown or his mother, do not equally apply to non-owners. Holmes did not reply to the government's response, which may be a concession of the point. *See Alito v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011).

In any event, the court agrees with the Government. Holmes lacked any possessory interest in or right to exclude others from the property. *See United States v. Carslisle*, 614 F.3d 750, 758 (7th Cir. 2010). Nor did he exhibit a subjective expectation to be free from government intrusion or employ precautions to maintain privacy. *Id.* Thus, the officers walking onto the curtilage of the property did not infringe upon Holmes's Fourth Amendment right.

**IT IS THEREFORE RECOMMENDED** that defendant's Motion to Suppress Evidence (ECF No. 8) be **denied**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and Fed. R. Crim. P. 59(b)(2) whereby written objections to any recommendation herein or part thereof may be filed within fourteen days of service of this recommendation or prior to the Final Pretrial Conference, whichever is earlier. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin this 10th day of November, 2015.

WILLIAM E. DUFFIN
U.S. Magistrate Judge