# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA**
        **Plaintiff,**

    **v.**                                 **Case No. 15-CR-129**

**DONTA HOLMES, JR.**
             **Defendant.**

---

## DECISION AND ORDER

Defendant Donta Holmes filed a motion to suppress a firearm the police recovered from his person, arguing that the officers lacked reasonable suspicion to seize him. The magistrate judge handling pre-trial proceedings in this case held an evidentiary hearing on the motion, then issued a recommendation that it be denied. Defendant objected, and I held a de novo hearing to explore alleged discrepancies in the testimony from the arresting officers. See Fed. R. Crim. P. 59(b). On review of the entire record, I now deny the motion.

## I. FACTS

### A. Hearing Before Magistrate Judge

#### 1. Government Testimony

The government presented testimony from Milwaukee police officers Jacob Ivy and Mark Horstmeyer. On the afternoon of May 3, 2015, Ivy and Horstmeyer responded to a tip from an anonymous caller "that a black male in his 20s, wearing all black, with dreadlocks and a ponytail was armed with a firearm in his pocket and was possibly involved in a shooting the week before." (9/10/15 Evid. Hr'g Tr. [R. 15] at 6.) The tipster further indicated that the person was located at a specific address on North 30th Street. (Tr. at 6.) Ivy testified that he

volunteered to back up officers Daniel Lewis and Timothy Toth, who were initially dispatched on the call, because he was familiar with this address, which had "been on our roll call board numerous times for drug dealing complaints." (Tr. at 8.) Ivy further indicated that the address was located in a high crime area. (Tr. at 8, 50.) The assignment was designated "priority one," i.e., a situation involving great danger. (Tr. at 8, 50-51.)

The officers decided that Lewis and Toth would approach the residence from the front, Ivy and Horstmeyer from the alley to the rear. (Tr. at 9, 51.) On the way to the alley, Ivy drove past the front of the residence, and Horstmeyer pointed out that a subject matching the tipster's description was standing in the yard, along with several other people. Ivy testified to at least six other people in the yard; Horstmeyer recalled about eight to ten. Just one person matched the tipster's description. (Tr. at 10, 51, 53-54.)

Ivy parked in the alley, and he and Horstmeyer walked into the yard through the rear gateway, which was wide open. (Tr. at 11.) As the officers approached, the subject (later identified as defendant) looked at Ivy, making eye contact, then quickly turned his body away, placing both of his hands in the front of his waistband. (Tr. at 12.) Ivy testified that it looked like defendant was trying to move an object or take something out of his waistband. Ivy further indicated that, based on his training and experience, when somebody puts their hands in front of their waistband like this it usually means they are armed. (Tr. at 15.) Defendant walked away, slowly at first, but as Ivy came into the yard "it turned to a brisk walk." (Tr. at 12.) Horstmeyer testified that no one else in the group of people in the yard turned and walked away from the officers. (Tr. at 54-55.)

Concerned that defendant was going to take a firearm out of his waistband and possibly shoot the officers with it, Ivy yelled at defendant to stop moving and show his hands. (Tr. at

2

12-13.) Ivy drew his gun and held it in the low ready position. He repeated the command to stop, but defendant kept walking away, still looking at Ivy, still with his hands in his waistband. (Tr. at 13.) Horstmeyer recalled Ivy yelling, "stop, police," more than once. (Tr. at 55.)

Based on defendant's failure to stop and show his hands, Ivy ran up behind him, wrapped his arms around him, and tackled him to the ground. (Tr. at 14.) The officers testified that defendant did not cooperate with Ivy's attempt to handcuff him, failing to bring his hands behind his back after being told several times to do so, and reaching toward his left front pocket; Horstmeyer and Lewis helped Ivy get defendant's hands behind his back, and Ivy was able to handcuff him. (Tr. at 14-15, 55.) Toth found a revolver in defendant's left front pants pocket. (Tr. at 15.)

Ivy estimated that about 15-20 seconds passed from the time he made eye contact with defendant to the time he tackled defendant to the ground, and that defendant moved about 50 feet. (Tr. at 16.) Horstmeyer estimated that defendant moved "at least ten feet" and about 15 seconds elapsed from the time the officers began their approach to the time Ivy tackled defendant. (Tr. at 56.) On cross examination, Horstmeyer said defendant moved for about five seconds, and he agreed that defendant "wasn't moving very fast." (Tr. at 64.)

Ivy indicated that he felt he had to act quickly given the information that defendant was possibly involved in a shooting; he did not want to get into a foot pursuit or have defendant hurt somebody else with the firearm. (Tr. at 17.) Ivy further testified that his initial intention when approaching was to get defendant's name, make sure he was not involved in a shooting, ask if he was armed and, if so, whether he had a permit to carry the gun. (Tr. at 30, 44.) However, defendant did not give him the opportunity to do that. (Tr. at 45.)

3

### 2. Defense Testimony

Defendant's friend Marquise Brown testified that he lived at the subject residence with his mother, and that on the afternoon of May 3, 2015, he held a small gathering at the house, about eight to ten people, including defendant. (Tr. at 69-71.) Brown testified that officers came into his yard through the alley, ran past him, and tackled defendant. (Tr. at 74-75, 78.) On cross examination, Brown clarified that he was grilling at the time, his head was down, and by the time he turned around the officers already had defendant on the ground. (Tr. at 78-79.) Brown went into the house to notify his mother and did not come back out until after the officers removed defendant from the scene. (Tr. at 76.)

Defendant's cousin, Shontrell Calhoun, testified that on the afternoon of May 3, 2015, she had planned to pick defendant up from an address on North 30th Street and take him to see his kids. (Tr. at 82.) Defendant called Calhoun on her cell phone earlier that day to make plans, but by the time she arrived to pick him up her phone was dead so she used her ex-boyfriend's cell phone to call defendant. (Tr. at 83.) She testified that she was on the phone with defendant while she was turning the corner onto 30th Street, driving her ex-boyfriend's vehicle, the make and model of which she did not know. (Tr. at 83-84.) Calhoun testified that she called defendant to let him know she was pulling up outside, and he should walk to the front so she could take him to see his children. (Tr. at 85.) Calhoun testified that as defendant approached he looked a little confused because she normally drove her mother's car. She let him know the color of the car she was driving, then hung up and watched him put his phone in his pocket. (Tr. at 86.) Defendant took three or four steps forward and out of nowhere a police officer came up and tackled him. (Tr. at 86-87.) The only people Calhoun saw in the yard were defendant and his younger brother. (Tr. at 89.)

4

Finally, defendant testified that in late April 2015, about six days before he was arrested, his lung collapsed, requiring hospitalization. (Tr. at 93-94.) He was released from the hospital on a Friday, after two surgeries, and on the following Sunday he went to a barbecue at Brown's house. (Tr. at 95, 97.) He admitted smoking marijuana earlier that day. (Tr. at 96, 105.) Defendant testified that he had arranged for Calhoun to pick him up from the barbecue and take him to see his kids on the south side of Milwaukee. (Tr. at 97.) Defendant further testified that just before he was arrested he was on the phone with Calhoun, who told him she had pulled up. (Tr. at 100.) He hung up the phone, placed it in his pocket, and began walking toward the car when someone came up behind him and tackled him to the ground. (Tr. at 101.)

Defendant testified that just before he was tackled he heard Brown's younger brother yell out, "there's the boys" (Tr. at 101), which he understood to mean the police (Tr. at 102, 109). However, he said he was not concerned about police contact that day, even though he had a pistol in his pocket, because he had a permit. (Tr. at 103.) He testified that he did not walk away from the police knowing they were trying to stop him; nor did he hear any police commands directed at him before he was tackled. (Tr. at 104.) In a post-arrest statement to the police, defendant indicated that after he heard "the boys" he turned his head to make sure his gun was in his back pocket, not sticking out. (Tr. at 110.) At the hearing before the magistrate judge, he testified that he was tackled within a split second of turning. (Tr. at 112.)

In his post-arrest statement, defendant never said anything about being on the phone with Calhoun prior to his arrest.[1] Rather, he said he was texting. At the evidentiary hearing

_____

[1]Ivy did not recall seeing defendant talking on a cell phone prior to the stop. (Tr. at 16.) Ivy further testified that the movement he observed was not consistent with defendant putting a cell phone in his pocket. (Tr. at 41.) Horstmeyer testified that after they took defendant into custody he observed a phone on the ground, but he never saw defendant on the phone. (Tr.

5

before the magistrate judge, defendant said on cross-examination that he was on Facebook at the time, browsing, "playing on my key strokes" (Tr. at 111), before he put the phone in his pocket (Tr. at 107-08).[2]

## B.   De Novo Hearing

### 1.   Government Testimony

At the de novo hearing, the government again called officers Ivy and Horstmeyer, and they testified similarly. Ivy stated that on the date in question he offered to back up Toth and Lewis based on his familiarity with the subject address, which he had seen on the roll call board due to drug dealing complaints. He further indicated that he had previously arrested a suspect who lived at this address following a foot pursuit during which the suspect discarded a firearm. Ivy also elaborated on his belief that this was a high crime area based on shots fired calls, drug dealing, and robberies.

Ivy indicated that after he made eye contact with defendant, defendant quickly turned away, placed his hands in front of his waistband, and moved away at an increasing pace while glancing back over his right shoulder. Ivy commanded defendant to stop and show his hands several times, but defendant kept moving. Defendant was the only person in the group in the yard who moved away from the officers. Ivy testified that based on his training and experience defendant's hand movements were consistent with possession of a firearm. Concerned that he may draw a firearm and harm the officers, Ivy ran up and tackled defendant to the ground.

at 57.)

[2]Defendant also testified that the pants he was wearing the day of his arrest had a tendency to slip down. (Tr. at 115.) Ivy indicated that in his work he had seen young men hike up their baggy pants, but he did not recall if defendant's pants were sagging on this occasion. (Tr. at 47.)

6

Ivy estimated that about 15 seconds elapsed and defendant moved about 50 feet from the time he entered the yard and they made eye contact to when he tackled defendant.[3] Ivy believed that defendant was, at the start of the counter, behind a children's slide depicted in hearing exhibits 1004 and 1007 (photos of the yard at the subject resident), more towards the alley. However, Ivy did not remember the slide being there at the time of the encounter.

After the stop, Ivy learned that defendant had a CCW permit. Ivy testified that, in his experience, persons permitted to carry a concealed weapon usually cooperate with the police. Most of the time, they even allow him to hold onto the firearm during the encounter.

Horstmeyer testified that when the officers entered the yard, defendant turned, looked at the officers, and then walked away. At that point, Ivy got in front of Horstmeyer, obstructing Horstmeyer's view of defendant. Horstmeyer watched the other individuals in the yard for officer safety. Horstmeyer heard Ivy loudly say, "stop, police," several times; he then saw Ivy tackle defendant to the ground, and Horstmeyer assisted with handcuffing defendant.

Horstmeyer estimated that about 10-15 seconds elapsed from the time they entered the yard and observed defendant to when Ivy tackled defendant. Horstmeyer further testified that defendant started in front of the children's slide depicted in exhibits 1004 and 1007. However, Hortsmeyer also did not recall the slide being there at the time of the encounter. Viewing a photo of the scene with distance markings, Horstmeyer estimated that defendant moved about 25 feet. (2/1/16 Hr'g Ex. 1012.) Horstmeyer again stated that he found a phone on the ground near where defendant was tackled, but he never saw defendant on the phone. Ivy likewise testified that he never saw defendant on a cell phone. After the officers took defendant into

---

[3]The subject lot measures a little over 100 feet from front to back. (2/1/16 Hr'g Ex.1009.)

custody, they discovered that he had two outstanding warrants.

### 2. Defense Testimony

The defense called officers Toth and Lewis, who testified that they approached the subject residence in separate squad cars. Toth testified that as he pulled up in front of the residence (heading southbound), he saw defendant running from the back yard to the front, Ivy in pursuit. Ivy tackled defendant, and Toth exited his squad to assist. He did not see the start of the encounter. Lewis approached the residence heading northbound; by the time he pulled up, Ivy already had defendant on the ground.

Finally, the defense called Jaylind Newell, defendant's step-brother, who testified that he was at the barbecue on May 3, 2015. He testified that the police opened the gate, ran toward defendant (who was talking on his phone while walking toward the front yard), and tackled him. Newell said that defendant was in front of the children's slide depicted in the photos when the police entered the yard. Newell testified that he was located by a bird path depicted in exhibit 1007, texting on his phone, at the time the police entered the yard.

## II. DISCUSSION

### A. Legal Standards

The police may detain a person in order to verify or dispel a reasonable suspicion that the person has been, is, or is about to engage in criminal activity. United States v. Griffin, 150 F.3d 778, 783 (7th Cir. 1998) (citing Terry v. Ohio, 392 U.S. 1, 21 (1967)). The officer initiating an investigatory stop must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, suggest criminal activity. United States v. Ruiz, 785 F.3d 1134, 1141 (7th Cir. 2015). While the officer may not rely on a mere hunch,

8

reasonable suspicion is a lower threshold than probable cause and considerably less than a preponderance of the evidence. Id. In determining whether the officer had the requisite particularized suspicion, the court considers the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect. Id. Finally, the officer may employ a measured use of force to accomplish the purposes of the investigatory stop, e.g., Jewett v. Anders, 521 F.3d 818, 824 (7th Cir. 2008), and may, during a lawful investigatory stop, conduct a pat-down if he reasonably suspects that the person is armed and dangerous, United States v. Leo, 792 F.3d 742, 749 (7th Cir. 2015).

**B.    Analysis**

The magistrate judge found reasonable suspicion for the stop and the search based on the anonymous tip, which suggested not just firearm possession but also defendant's involvement in a recent shooting; the location of the encounter, a house in a high crime area which had been the subject of a numerous drug dealing complaints; and, most importantly, defendant's suspicious behavior once the police arrived, turning away, placing his hands near his waistband, and walking away at a quickening pace.

In his objections, defendant argues that (1) Ivy lacked reasonable suspicion that defendant possessed a firearm, and (2) even if Ivy did reasonably suspect weapon possession he lacked grounds for concluding such possession was unlawful. Considering the evidence from both hearings, I find Ivy's testimony credible, and that his observations, coupled with the tip, provided reason to believe defendant had a gun. I further find that, given defendant's evasive behavior, a reasonable officer could conclude defendant's firearm possession was unlawful.

9

### 1.    Reasonable Suspicion of Firearm Possession

#### a.    The Tip

Defendant notes that, under <u>Florida v. J.L.</u>, 529 U.S. 266, 268 (2000), an anonymous tip that the suspect has a gun, without more, is insufficient to justify a <u>Terry</u> stop.  In that case, the officers had no reason to suspect criminal activity aside from the tip.  "The officers did not see a firearm, and J.L. made no threatening or unusual movements."  <u>Id.</u>; <u>see also id.</u> at 270 ("[T]he officers' suspicion that J.L. was carrying a weapon arose not from any observations of their own but solely from a call made from an unknown location by an unknown caller.").

In the present case, conversely, Ivy made further observations leading him to believe defendant was armed.[4]  Specifically, after defendant made eye contact with Ivy he quickly turned and walked away – the only person at the gathering to do so – while placing his hands in front of his waistband in a movement Ivy believed, based on his training and experience, suggested possession of a firearm.  Defendant then ignored Ivy's repeated commands to stop and show his hands.  <u>See</u> <u>United States v. Oglesby</u>, 597 F.3d 891, 894-95 (7th Cir. 2010) (finding reasonable suspicion where, on the arrival of the police, the defendant slowly retreated

---

[4]The tip in the present case also alleged more than mere weapon possession; the tipster claimed that defendant was "involved" in a shooting that occurred in the area one week ago. (2/1/16 Hr'g Ex. 1.)  The Seventh Circuit has distinguished <u>J.L.</u> where the tip is not one of general criminality but of an ongoing emergency or very recent criminal activity.  <u>See, e.g.</u>, <u>United States v. Hicks</u>, 531 F.3d 555, 558-59 (7th Cir. 2008); <u>see also</u> <u>United States v. Winbush</u>, 337 F.3d 947, 950 (7th Cir. 2003); <u>United States v. Lenoir</u>, 318 F.3d 725, 729 (7th Cir. 2003).  At the de novo hearing, Ivy testified that while this was a "priority one" call, he did not characterize it as an emergency.  It is also true, as defendant notes, that the police did not corroborate the shooting or the nature of the subject's "involvement" in it prior to the stop. Nevertheless, the officers here had more information than in <u>J.L.</u> Given the absence of details about the shooting in the tip, defendant disputes the magistrate judge's inference that defendant was the shooter.  I agree with the magistrate judge that a reasonable inference to be drawn from the tip is that defendant was a perpetrator rather than a victim or witness to the shooting, and that this was a factor Ivy could consider in approaching defendant.

10

from a group of young men (the only one to do so), angled his body away from the officers, and repeatedly lowered his hand toward his pocket despite the officers' instructions that he show his hands, in a high crime area); United States v. Mancillas, 183 F.3d 682, 698 (7th Cir. 1999) (finding reasonable suspicion where the officer received a dispatch stating that a Hispanic male seated in a blue Mercedes had a gun, on arrival the officer observed three individuals including a Hispanic male in the car, and the three men behaved suspiciously by each walking off in a different direction).

### b.    Defendant's Behavior

Defendant takes issue with the magistrate judge's characterization of his behavior after the officers arrived.  He contends that his stroll to the front yard was entirely consistent with catching a ride from Calhoun; that his slow pace was inconsistent with flight; that his hand movements were consistent with hiking up baggy pants; and that the magistrate judge made no mention of the cell phone Horstmeyer saw on the ground.  Defendant states that he simply walked away from Ivy and Horstmeyer (but toward two other officers) to the street where Calhoun was to pick him up.

The magistrate judge credited the officers' testimony regarding defendant's behavior, but he made no specific finding on the credibility of defendant's claim (corroborated in part by Calhoun) that defendant was simply walking towards his ride rather than fleeing the police. However, the court evaluates the totality of the circumstances as they appeared to the officer at the time of the stop, United States v. Hendricks, 319 F.3d 993, 1001 (7th Cir. 2003), and even if defendant's claim is true the record contains no evidence that the officers knew or should have known that defendant was walking toward Calhoun's car.  Horstmeyer saw a cell phone on the ground after Ivy tackled defendant, but neither officer saw defendant talking on a cell

11

phone prior to the stop. Further, while the officers planned for Lewis and Toth to approach from the front, the testimony at the de novo hearing made clear that those officers had not yet arrived by the time Ivy entered the back yard and pursued defendant. Ultimately, the relevant inquiry is not whether particular conduct is innocent or guilty but the degree of suspicion that attaches to particular types of noncriminal acts, id.; that defendant's conduct could be susceptible of innocent explanation does not defeat reasonable suspicion. See Ruiz, 785 F.3d at 1142; United States v. Riley, 493 F.3d 803, 809-10 (7th Cir. 2007).

In any event, the record contains several reasons for doubting defendant's version. First, defendant admitted that he had used high grade marijuana earlier that day, which may have affected the reliability of this testimony. Second, defendant provided conflicting statements about what he was doing with his phone before Ivy tackled him. On direct examination, he said he finished talking to Calhoun, pressed end, put the phone in his pocket, and a second or two later he was tackled. (Tr. at 101.) However, in his post-arrest statement to the police defendant said nothing about talking to Calhoun;[5] rather, he said he was texting on his phone. (Tr. at 107.) Confronted with this statement at the hearing before the magistrate

_____

[5]The government notes that there are also reasons for doubting Calhoun's testimony. She said she saw only two people in the yard, defendant and defendant's younger brother, but other witnesses said six to ten people were there. Neither Calhoun nor defendant provided confirmation of their conversation through a phone's call history. Calhoun claimed she used her ex-boyfriend's phone because her's had died. She also claimed to be driving her ex-boyfriend's car that day, the make and model of which she could not provide. Finally, as defendant's cousin, Calhoun may have had reason to slant her testimony in his favor to avoid his conviction of a felony. Similar concerns can be raised about Newell's testimony, based on his familial relationship with defendant. He also testified that he was texting on his phone at the time of the encounter, which likely distracted his attention. He further claimed, contrary to all of the other testimony, that the officers opened the gate to enter the yard. In any event, defendant in his objections makes no claim that the police violated his Fourth Amendment rights by entering the yard uninvited. See, e.g., United States v. Mendoza, 438 F.3d 792, 795 (7th Cir. 2006) ("A defendant cannot assert a privacy interest on behalf of someone else.").

12

judge, defendant then said he was on Facebook at the time. (Tr. at 111.) Third, while defendant denied knowingly ignoring the police commands to stop, he did admit to turning his head when he heard "the boys" were coming. He stated that he wanted to make sure his gun was in his back pocket so he would not be shot if the officers saw the weapon; however, the officers found the firearm in his <u>front</u> pocket. Fourth, while defendant in his objections attempts to explain his hand movements as pulling up sagging pants, he made no such claim during his testimony, and Ivy testified at the hearing before the magistrate judge that he did not notice defendant's pants sagging on this occasion. At the de novo hearing, Ivy testified that he had seen people holding up their pants countless times, and it did not appear defendant was doing that. <u>See</u> <u>United States v. Briggs</u>, 720 F.3d 1281, 1288 (10th Cir. 2013) (holding that officer did not have to rule out possibility the defendant was pulling up his pants); <u>see also</u> <u>United States v. Patton</u>, 705 F.3d 734, 741 (7th Cir. 2013) ("[T]he reasonable suspicion standard does not demand that the possession of a weapon be the sole or most likely explanation for a suspect's behavior.").

Defendant contends that, because the police lacked reasonable suspicion for a stop based on the tip alone, he was free to ignore Ivy's commands and go about his business. <u>See</u> <u>United States v. Johnson</u>, 620 F.3d 685, 694 (6th Cir. 2010) (citing <u>Illinois v. Wardlow</u>, 528 U.S. 119, 125 (2000); <u>Florida v. Royer</u>, 460 U.S. 491, 498 (1983)). He notes that, unlike in <u>Wardlow</u>, he did not engage in "headlong flight" but simply walked away.

However, reasonable suspicion does not require a sprint. <u>See</u> <u>Briggs</u>, 720 F.3d at 1287 ("'Bolting' from officers is not the only relevant and obvious form of evasion."). As the <u>Johnson</u> court noted, judges consider "the abruptness and other evasive characteristics of a suspect's departure upon noticing the police to determine whether his reaction contributes to reasonable

13

suspicion." 620 F.3d at 694. The Johnson court cited several examples.

For instance, in United States v. Pearce, 531 F.3d 374, 382 (6th Cir. 2008), the court found reasonable suspicion when, upon seeing a police officer, the defendant hunched over, placed his right hand in the small of his back, and started backing away. In United States v. Paulette, 457 F.3d 601, 602 (6th Cir. 2006), the court found reasonable suspicion when the defendant, who had just engaged in a hand-to-hand transaction in a high-crime area, quickly moved his hand to his pocket and began to walk away from the officers upon noticing their approaching squad car. In United States v. Davis, 331 Fed. Appx. 356, 358, 360 (6th Cir. 2009), the court approved a stop where the defendant emerged from a known drug house with a "deer-in-the-headlights" look and proceeded to pick up the pace to cross the street upon seeing two officers on patrol. And in United States v. Craig, 306 Fed. Appx. 256, 262 (6th Cir. 2009), the court found reasonable suspicion based on the defendants' abrupt change in direction upon the officer's arrival and their circuitous, seemingly evasive exit route from the parking lot. See also Briggs, 720 F.3d at 1287 ("A sudden change of direction upon seeing law enforcement, increased speed in an apparent attempt to create distance from the officers, and repeated glances over one's shoulder are circumstances that reasonably suggest evasion.").

In Johnson, conversely, the defendant did not change course or otherwise react suspiciously to the police. Instead, his trajectory remained constant; he continued walking in the manner he had been walking – at a normal pace and in the direction he had been walking when the officers first observed him. 620 F.3d at 695. The court found this a quintessential example of going about one's business, and that the police lacked reasonable suspicion to stop him based on a 911 call that made no specific allegation of criminal activity. Id. at 696.

In the present case, the officers responded to a more specific tip than in Johnson, and

14

defendant responded to their presence evasively, as discussed above. Defendant contends that he walked slowly and towards two officers approaching from the front of the house. As also discussed above, Ivy, who focused on defendant, said defendant started slowly but then picked up the pace.[6] Further, while the police planned for two officers to approach from the front, Lewis and Toth arrived only after Ivy started chasing defendant. Defendant contends that he did not respond when Ivy ran up on him by, for instance, altering his path, taking a defense stance, or removing his gun. However, he continued to move away at a quickening pace, with his hands in the area where Ivy believed he had a gun. See Briggs, 720 F.3d 1288 (noting that a suspect's hand movement towards his waistline suggests weapon possession in a way that having hands in a sweatshirt pocket would not).

### c. Consistency of the Officers' Testimony

Defendant next faults the magistrate judge for failing to reconcile conflicts in the officers' testimony. Having reviewed the transcript of the hearing before the magistrate judge and having heard them testify first-hand, I see no material differences.

At the hearing before the magistrate judge, on direct examination both officers said that about 15 seconds elapsed from the beginning of the encounter to the time Ivy tackled defendant. (Tr. at 16, 56.) Later, on cross-examination, counsel asked Horstmeyer to estimate how long defendant walked from the gangway to the front yard, counting one 1000; two1000, etc., and Horstmeyer stopped counsel at five 1000. (Tr. at 64.) However, this was not the same question Horstmeyer was asked on direct examination, which started the clock on their initial approach. In any event, both officers testified to estimates of time based on a fluid

---

[6]Defendant makes no claim that his recent surgeries rendered him unable to walk briskly.

situation.

It is true that at the first hearing Ivy said defendant traveled about 50 feet (Tr. at 16), while Horstmeyer said it was "at least ten feet." (Tr. at 56.) Again, however, both officers were estimating, and Ivy made his estimate while looking at an aerial map of the scene introduced at that hearing. (Tr. at 16.) At the de novo hearing, when given a chance to view a photo with distance markings, Hortsmeyer said defendant moved about 25 feet. (2/1/16 Hr'g Ex. 1012.)

It is also true that Ivy testified he told defendant to stop moving and show his hands (Tr. at 12), while Horstmeyer testified that Ivy said only, "stop, police." (Tr. at 55.) The difference is slight and explainable; Ivy was the one yelling the commands, so it would stand to reason he would have more thorough recall of that he said. Further, Horstmeyer testified that he kept an eye on the other people on the yard, while Ivy focused on defendant. (Tr. at 54.)

Defendant further notes that, on cross examination, Horstmeyer agreed that defendant "wasn't moving very fast." (Tr. at 64.) Ivy said it was a slow walk at first but then turned into a brisk walk as he came further into the yard. (Tr. at 12.) Again, given that Ivy focused on defendant, while Horstmeyer kept an eye on the others with his view of defendant partially blocked (Tr. at 55), there is no real inconsistency here.

Finally, defendant claims a contradiction between Ivy and Horstmeyer as to where defendant was when the officers first saw him. At the hearing before the magistrate judge, Ivy said defendant "was just behind the gangway in the rear yard but not all the way back in the rear yard." (Tr. at 24.) Horstmeyer said defendant was in the gangway area closer to the front yard. (Tr. at 64.) At the de novo hearing, Ivy said defendant started behind the children's slide depicted in the photos, more towards the alley, while Horstmeyer had defendant in front of the slide. It is unclear whether the slide was even there at the time of this encounter, making it a

16

dubious reference point. In any event, these differences are also slight and explainable by the fact that Ivy focused on defendant, while Horstmeyer kept an eye on the others.

In sum, given the lack of any material variances in their testimony, I agree with the magistrate judge that officers Ivy and Horstmeyer presented a credible version of events.[7]

### d. High Crime Area

Finally, defendant argues that the magistrate judge placed too much weight on the "high crime" location of the stop. However, defendant admits that this is a relevant factor, and the magistrate judge devoted just one sentence of his recommendation to it before noting that location in a high crime area alone does not establish reasonable suspicion. (R. 22 at 7.) Moreover, this is not a case where the officers relied on a generic claim of high crime; Ivy testified that he was familiar with this particular address because it was on the roll call board due to drug dealing complaints. At the de novo hearing, he testified to having arrested a suspect with a gun from this address. Defendant also criticizes the magistrate judge for failing to appreciate the overall context, where the encounter occurred during a low-key barbecue on a nice spring afternoon. However, this does not mean the police were required to ignore the other information they had about this address.

### 2. Reasonable Suspicion of Illegal Gun Possession

Defendant argues that even if Ivy reasonably believed defendant had a gun, Ivy could not simply assume the possession was illegal. He faults the magistrate judge for failing to specify what crime the police suspected in light of the changed legal landscape brought about by the Supreme Court's recent Second Amendment decisions and Wisconsin's allowance of

---

[7]Because they arrived on the scene at the end of the encounter, the testimony from officers Toth and Lewis adds little.

17

concealed carry.  See Leo, 792 F.3d at 752; United States v. Williams, 731 F.3d 678, 693-94 (7th Cir. 2013) (Hamilton, J., concurring).

The government concedes that merely possessing a gun is not necessarily a crime. Indeed, Ivy testified that it was his intention to ask defendant if he was armed and, if defendant said yes, ask if defendant had a permit.  (Tr. at 30.)  However, defendant did not give Ivy a chance to do so because he quickly departed the scene.  (Tr. at 45.)

I agree with the government that defendant's actions on seeing the police provided reasonable suspicion that his possession of a firearm was not legal.  A person who lawfully possesses a gun likely would not turn away quickly on seeing the police, move away at an accelerating pace, ignore commands to stop, and hold his hands by his waistband as if trying to conceal the gun.  At the de novo hearing, Ivy noted how defendant's behavior differed from what he usually sees with CCW permit holders.  Coupled with the information Ivy had from the tip regarding defendant's involvement in a recent shooting, these observations provided reasonable suspicion that defendant possessed the gun illegally.

Recent legal developments have indeed changed the landscape; an officer can no longer automatically assume that anyone carrying a firearm in public is committing a crime. However, the Terry standard remains the same: "Reasonable suspicion does not require the elimination of all innocent explanations for questionable behavior."  Briggs, 720 F.3d at 1289. As the Briggs court noted, "an officer observing an evasive suspect [need not] disregard indications that the suspect is carrying a concealed weapon at his waistline merely because it is possible the suspect has a concealed-carry permit."[8]  Id.; see also United States v. Lewis,

_____

[8]In Briggs, the court upheld a stop where the defendant, on seeing the police, changed direction, repeatedly looked over his shoulder at the officers, grabbed at the waistline of his

18

674 F.3d 1298, 1304-05 (11th Cir. 2012) (upholding <u>Terry</u> stop based on weapon possession even though such possession could be – and, the officers later learned, in this instance <u>was</u> – permitted under state law).

### III. CONCLUSION

For these reasons and those stated by the magistrate judge, I find that the officers had reasonable suspicion to believe defendant was armed, and that his weapon possession was unlawful. Defendant makes no claim that the officers carried out the stop in an unreasonable manner. <u>See</u> <u>United States v. Shoals</u>, 478 F.3d 850, 853 (7th Cir. 2007).

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (R. 22) is adopted, and defendant's motion to suppress (R. 8) is **DENIED**.

**IT IS FURTHER ORDERED** that the case is scheduled for **STATUS** on **Monday, February 22, 2016, at 11:30 a.m.**

Dated at Milwaukee, Wisconsin, this 15th day of February, 2016.

/s Lynn Adelman
LYNN ADELMAN
District Judge

---

pants, and picked up his pace as the officers approached. <u>Id.</u> at 1283

19